1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FRANCISCO BARRETTO,

11            Plaintiff,              No. CR S-07-1544 FCD DAD P

12       vs.

13   L. SMITH, et al.,

14            Defendants.          FINDINGS AND RECOMMENDATIONS

15   _____/

16            Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  The matter is before the court on defendants' motion for summary

18   judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has filed

19   an opposition to the motion, and defendants have filed a reply.

20                              BACKGROUND

21            Plaintiff is proceeding on his first amended complaint.  Therein, he alleges as

22   follows.  On April 3, 2007, a riot occurred between ten Asian/Pacific Islander inmates and ten

23   Norther Hispanic inmates at High Desert State Prison (HDSP).  The two groups were engaged in

24   fist to fist combat.  During the riot prison guards used pepper spray and tear gas in an attempt to

25   stop the violence.  Several shots from a "40mm launcher," as well as three shots from a Mini-14

26   /////

                                     1

1    rifle, were also fired.  (Am. Comp. at 3.)[1]

2         Plaintiff, an Asian/Pacific Islander, was involved in the riot and was defending

3    himself from an attack by a Northern Hispanic inmate when defendant Smith fired his Mini-14

4    rifle, striking plaintiff in his left upper arm.  After being shot plaintiff was approached by

5    defendant Look who ordered plaintiff to submit to being handcuffed.  Plaintiff informed Look

6    that he had been shot in the arm.  Look then handcuffed plaintiff, grabbing his arms and pulling

7    them behind his back, damaging the muscles, tendons, and nerves in plaintiff's wounded arm.

8    Plaintiff remained handcuffed on the ground for some time, causing more damage to his

9    wounded arm.  (Am. Comp. at 3-4.)

10        Plaintiff alleges that prior to the riot on April 3, 2007, there had been an ongoing

11   conflict between Asian/Pacific Islander inmates and Northern Hispanic inmates at HDSP for two

12   years.  Just before the riot, plaintiff and his fellow Asian/Pacific Islander inmates were

13   summoned to the office of Defendants Wright and Schirmer.  There, they were informed that ten

14   Asian/Pacific Islander inmates and ten Northern Hispanic inmates were going to be released off

15   lock-down and returned to normal programing.  Plaintiff and his fellow inmates informed Wright

16   and Schirmer that they were going to file a complaint alleging that Wright and Schirmer had

17   unlawfully retaliated against the Asian/Pacific Islander inmates by initially placing them in

18   Administrative Segregation.  (Am. Comp. at 4.)

19        Plaintiff also alleges that on December 19, 2007, approximately eight months after

20   the riot, plaintiff was in Administrative Segregation.  Defendant Smith was serving dinner trays

21   when he approached plaintiff's cell with his dinner tray.  Smith then stated "Hey, you're that

22   dude I shot during that riot a couple months back, huh, you kinda had that coming anyway for

23   what your homies did to my partner on A-Yard last year, you know what's up you and your

24   homies stick together and me and my homies stick together."  Smith then handed plaintiff his

25

26        [1] Page number citations such as this one are to the page number reflected on the court's
     CM/ECF system and not to page numbers assigned by petitioner.

1  dinner tray and continued on to serve the other prisoners while smiling.  (Am. Comp. at 7-8.)

2          Plaintiff's amended complaint seeks relief with respect to his claims that

3  defendants Smith and Look used excessive force against him, that defendants Schirmer and

4  Wright failed to protect him, and that defendants Schirmer, Wright and Smith retaliated against

5  him.  (Am. Comp. at 8-21.)

6                          PROCEDURAL HISTORY

7          On June 4, 2008,  the court ordered the United States Marshal to serve plaintiff's

8  complaint on defendants Look, Schirmer, Smith and Wright.  On August 8, 2008, defendants

9  moved to dismiss the entire action pursuant to non-enumerated Rule 12(b) due to plaintiff's

10  alleged failure to exhaust his administrative remedies.

11          On November 20, 2008, the undersigned issued findings and recommendations,

12  recommending that defendants' non-enumerated Rule 12(b) motion to dismiss be granted as to

13  plaintiff's claims that defendants Schirmer and Wrights failed to protect or retaliated against him.

14  However, the court recommended that the motion to dismiss be denied as to plaintiff's claims

15  that Smith and Look used excessive force and as to plaintiff's claim that Smith retaliated against

16  him.  On March 9, 2009, the assigned district judge adopted those findings and recommendations

17  in full.  On May 7, 2009, defendants Smith and Look filed an answer.  On May 11, 2009, the

18  undersigned issued a discovery order.[2]

19          On January 13, 2010, defendants filed the instant motion for summary judgment,

20  arguing that:  (1) the evidence submitted in support of the motion established that defendants

21  Smith and Look did not use excessive force against plaintiff; (2) plaintiff's excessive use of force

22  claim should be raised in a habeas petition and not in a § 1983 action; and  (3) defendants Smith

23  and Look are entitled to qualified immunity.

24  /////

25
26          [2]  The May 7, 2009, filing was an "Amended Answer" since defendants original answer,
     filed May 1, 2009, mistakenly included defendants Schirmer and Wright.  (Doc. Nos. 54 and 56.)

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' "  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n. 11.  The opposing party

4

1   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

5   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

6   1436 (9th Cir. 1987).

7           In the endeavor to establish the existence of a factual dispute, the opposing party

8   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

9   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

10  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

11  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

12  genuine need for trial.' " Matsushita, 475 U .S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

13  committee's note on 1963 amendments).

14          In resolving the summary judgment motion, the court examines the pleadings,

15  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

16  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

17  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

18  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

19  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

20  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

21  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

22  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

24  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

25  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

26  /////

5

1        OTHER APPLICABLE LEGAL STANDARDS

2   I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

3        The Civil Rights Act under which this action was filed provides as follows:

4        Every person who, under color of [state law] ... subjects, or causes
         to be subjected, any citizen of the United States ... to the
5        deprivation of any rights, privileges, or immunities secured by the
         Constitution ... shall be liable to the party injured in an action at
6        law, suit in equity, or other proper proceeding for redress.

7   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

8   actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

9   Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

10  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

11  meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or

12  omits to perform an act which he is legally required to do that causes the deprivation of which

13  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

14       Moreover, supervisory personnel are generally not liable under § 1983 for the

15  actions of their employees under a theory of respondeat superior and, therefore, when a named

16  defendant holds a supervisorial position, the causal link between him and the claimed

17  constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

18  (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

19  allegations concerning the involvement of official personnel in civil rights violations are not

20  sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

21  II.  Eighth Amendment and Excessive Force

22       The Eighth Amendment prohibits the infliction of "cruel and unusual

23  punishments."  U.S. CONST. AMEND. VIII.  The "unnecessary and wanton infliction of pain"

24  constitutes cruel and unusual punishment prohibited by the United States Constitution.  Whitley

25  v. Albers, 475 U.S. 312, 319 (1986).  See also Ingraham v. Wright, 430 U.S. 651, 670 (1977);

26  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  Neither accident nor negligence constitutes cruel

6

1  and unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good

2  faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."

3  Whitley, 475 U.S. at 319.

4          What is needed to show unnecessary and wanton infliction of pain "varies

5  according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S.

6  1, 5 (1992) (citing Whitley, 475 U.S. at 320).  To prevail on an Eighth Amendment claim the

7  plaintiff must show that objectively he suffered a "sufficiently serious" deprivation.  Farmer, 511

8  U.S. at 834; Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  The plaintiff must also show that

9  subjectively each defendant had a culpable state of mind in allowing or causing the plaintiff's

10 deprivation to occur.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

11         It is well established that "whenever prison officials stand accused of using

12 excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core

13 judicial inquiry is that set out in Whitley, i.e., whether force was applied in a good-faith effort to

14 maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson, 503 U.S.

15 at 6-7.

16 III.  Qualified Immunity

17         "Government officials enjoy qualified immunity from civil damages unless their

18 conduct violates 'clearly established statutory or constitutional rights of which a reasonable

19 person would have known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting

20 Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is presented with a qualified

21 immunity defense, the central questions for the court are (1) whether the facts alleged, taken in

22 the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a

23 statutory or constitutional right and (2) whether the right at issue was "clearly established."

24 Saucier v. Katz, 533 U.S. 194, 201 (2001).

25         Although the court was once required to answer these questions in order, the

26 United States Supreme Court has now held that "while the sequence set forth there is often

7

1  appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, ___ U.S. ___,

2  ___, 129 S. Ct. 808, 818 (2009).  In this regard, if a court determines that a plaintiff's allegations

3  do not make out a statutory or constitutional violation, "there is no necessity for further inquiries

4  concerning qualified immunity." Saucier, 533 U.S. at 201.  Likewise, if a court determines that

5  the right at issue was not clearly established at the time of the defendant's alleged misconduct,

6  the court may end further inquiries concerning qualified immunity at that point without

7  determining whether the allegations in fact make out a statutory or constitutional violation.

8  Pearson, 129 S. Ct. at 818-21.

9          In deciding whether the plaintiff's rights were clearly established, "[t]he proper

10  inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was

11  unlawful in the situation he confronted' . . . or whether the state of the law [at the relevant time]

12  gave 'fair warning' to the officials that their conduct was unconstitutional." Clement v. Gomez,

13  298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202).  The inquiry must be

14  undertaken in light of the specific context of the particular case.  Saucier, 533 U.S. at 201.

15  Because qualified immunity is an affirmative defense, the burden of proof initially lies with the

16  official asserting the defense.  Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536

17  (9th Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

18                     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

19  I.  Defendants' Statement of Undisputed Facts and Evidence

20          Defendants' statement of undisputed facts is supported by citations to declarations

21  under penalty of perjury by defendants Look and Smith, by HDSP Acting Warden M. McDonald,

22  and by true and correct copies of various documents.  Defendants' motion is also supported by

23  citations to plaintiff's deposition transcript.

24          The evidence submitted by the defendants establishes the following.  In April of

25  2007, plaintiff was incarcerated at HDSP Facility D-4.  At all relevant times Smith and Look

26  were employees of the California Department of Corrections and Rehabilitation and worked at

8

1   HDSP.  On April 3, 2007, a lockdown of Facility D-4 was ended and a riot broke out between

2   Northern Hispanic and Asian/Pacific Islander inmates.  (Defs.' SUDF at 2, Dec. Smith at 1-2,

3   Dec. Look at 1, Pl.'s Dep. at 33:5-8.)

4   When the riot began, defendant Smith was working as an Observation Officer and

5   was at his assigned post, observing the Facility D morning exercise yard #1.  As an Observation

6   Officer Smith is authorized to use increasing levels of force necessary to subdue an attack or gain

7   compliance with a lawful order.  The riot was one in a series of violent incidents at HDSP which

8   led to the two inmate groups in question being placed on lockdown status over a period of

9   several months.  In short, the Northern Hispanic inmates and the Asian/Pacific Islander inmates

10  at HDSP were at war.  (Defs.' SUDF at 3, Dec. Smith at 2-3, Dec. McDonald at 2, Pl.'s Dep. at

11  47:15-16.)

12  An unlock plan was developed on March 26, 2007.  Two meetings were held

13  between the two groups, first with the inmates restrained at the waist and then a second meeting

14  with the inmates unrestrained.  After the meetings proceeded without incident the unlock process

15  began with ten Northern Hispanic inmates and ten Asian/Pacific Islander inmates being released

16  to the morning yard session.  Under the plan, these inmates would be released for three days and,

17  if no incidents occurred, then the remainder of the two inmate groups would be released to

18  normal programming on April 5, 2007.  (Defs.' SUDF at 3, Dec. McDonald at 2, Pl.'s Dep. at

19  47:15-16.)

20  On April 3, 2007, as the Asian/Pacific Islander inmates and Northern Hispanic

21  inmates were being released, defendant Smith observed the two groups go to the tables between

22  two buildings.  In addition to the ten Northern Hispanic inmates and ten Asian/Pacific Islander

23  inmates approximately 60 other inmates were on the yard.  As the last two inmates were released

24  from lockdown, and were walking toward the tables, all twenty Asian/Pacific Islander and

25  Norther Hispanic inmates began fighting.  Defendant Smith observed the inmates striking each

26  other with closed fists about the face and upper torso area.  The riot was of such a magnitude it

9

1  required a Code III response, which is the highest level response, essentially calling for all

2  institutional staff to respond.  (Defs.' SUDF at 4, Dec. Smith at 2.)

3         Defendant Smith used the public address ("P.A.") system to order the inmates on

4  the yard to get down.  All inmates complied except the twenty Northern Hispanic and

5  Asian/Pacific Islander inmates involved in the riot.  Defendant Smith again used the P.A. system

6  to order the yard to "get down."  The twenty inmates continued fighting.  (Defs.' SUDF at 4,

7  Dec. Smith at 2.)

8         Defendant Smith observed an inmate lying on the ground flanked by two other

9  inmates who were kicking the prone inmate in his head and upper torso area.  Smith, concerned

10 that the prone inmate could suffer great bodily injury or death, fired a warning shot from his

11 state-issued Mini-14 rifle into a concrete wall.  The two attacking inmates then stopped their

12 attack.  Other inmates however continued to riot and multiple CN-109 ("tear gas") grenades were

13 deployed by officers.  (Defs.' SUDF at 4, Dec. Smith at 2-3.)

14        As the gas dispersed, defendant Smith observed an inmate strike another inmate in

15 the head with his fist.  The inmate receiving the blow, later identified as Armendariz, fell to the

16 ground, face down and apparently motionless.  Smith observed plaintiff standing over

17 Armendariz, kicking and stomping him in the head and upper torso area.  Fearing that plaintiff

18 would seriously injure or even kill Armendariz, Smith aimed his rifle at plaintiff's chest and fired

19 once.  When struck, plaintiff stopped his assault and fell to the ground.  Smith did not know the

20 identity of the inmate he shot and only discovered plaintiff's identity after the shooting.  Smith's

21 use of force was in compliance with California Department of Corrections and Rehabilitation

22 ("CDCR") policy.  (Defs.' SUDF at 5, Dec. Smith at 3, Dec. McDonald at 3.)

23        Defendant Look responded to the Code III alarm at Facility D and joined the

24 "skirmish line," a line of officers positioned at a safe distance from the riot.  The officers in a

25 skirmish line order the inmates to cease their actions and, once the incident or actions have

26 ceased, move in to secure and control the incident.  (Defs.' SUDF at 6, Dec. Look at 1-2.)

1    A "rescue circle" went into the melee to provide assistance to plaintiff.  After a

2 riot all inmates are restrained, in order to prevent additional assaults, the yard is processed for

3 evidence, and medical staff responds to triage inmates.  Defendant Look handcuffed plaintiff in

4 accordance with California Code of Regulations, title 15, section 3268.2(a)(2).  Look did not

5 recall if plaintiff told him he had been shot prior to the handcuffing, and he did not remember

6 seeing any blood on plaintiff.  After handcuffing plaintiff Look returned to the skirmish line.

7 (Defs.' SUDF at 6, Dec. Look at 2.)

8    A nurse examined plaintiff immediately after he was shot.  Thereafter he was sent

9 to an outside hospital in Reno, NV.  Upon returning to HDSP, he was placed in the Correctional

10 Treatment Center.  As a result of the April 3, 2007, riot plaintiff was charged with a CDC-115

11 Rules Violation for attempted murder, but was ultimately found guilty of battery resulting in

12 serious bodily injury.  (Defs.' SUDF at 6-8, Dec. Look at 2, Pl.'s Dep. at 76:9-17.)

13 II.  Defendants' Arguments

14    Defense counsel argues that the defendants are entitled to summary judgment in

15 their favor because Smith and Look did not use excessive force with any malice or intent to harm

16 plaintiff.  First, counsel argues that the defendants used only the amount of force necessary to

17 maintain order and restore discipline.  Specifically, defense counsel contends that the force used

18 by defendants Smith and Lock was employed solely to protect the correctional staff and inmates,

19 including plaintiff.  Smith and Lock reasonably perceived plaintiff as a threat to the safety and

20 security of staff and inmates and responded accordingly.  Moreover, prison officials had already

21 used more tempered amounts of force, without success, prior to plaintiff being shot.  (Defs.

22 Mem. of P. & A. at 11-16.)

23    Second, defense counsel argues that plaintiff's claim regarding the use of force

24 must be raised in a habeas petition, rather than a § 1983 action. In this regard, counsel contends

25 that a judgment in plaintiff's favor would necessarily imply the invalidity of his prison

26 disciplinary finding, invalidating his loss of good time credits.  (Defs. Mem. of P. & A. at 16-18.)

1   Finally, counsel argues that the defendants are entitled to qualified immunity.  For

2   the same reasons discussed above, defense counsel maintains that there is no evidence before the

3   court indicating that the defendants violated any of plaintiff's constitutional rights. (Defs. Mem.

4   of P. & A. at 18-20.)

5   III.  Plaintiff's Opposition

6   Plaintiff's opposition to defendants' motion for summary judgment is supported

7   only by a statement of undisputed facts.  In that opposition, plaintiff argues as follows.

8   Plaintiff argues that in shooting plaintiff, Smith both failed to protect him from

9   the harm he suffered and used excessive force against him.[3]  On the day of the riot Smith was

10  assigned as an Observation Officer on Delta Yard 1, where the riot occurred.  Plaintiff argues that

11  Smith was responsible for ensuring the safety and security of all inmates on that yard.  In this

12  regard, Smith was authorized to use increasing levels of force necessary to ensure the safety of

13  inmates, but, plaintiff argues, was not authorized to use deadly force to disrupt a fight.  (Pl.'s

14  SUDF at 2, Pl.'s Opp'n to Defs. Mot. for Summ. J. at 3 (Doc. No. 78).)

15  Prior to the riot, Northern Hispanic and Asian/Pacific Islander inmates had rioted

16  multiple times over several months.  Plaintiff claims that Defendant Smith knew or should have

17  known about the risks of allowing the two inmate groups to interact.  Moreover, when the riot

18  began, defendant Smith was at his assigned post observing the exercise yard and the controlled

19  release of the Northern Hispanic and Asian/Pacific Islander inmates.  Plaintiff reiterates his

20  argument that after the riot began he was attacked by a Northern Hispanic inmate.  Plaintiff

21  defended himself against the attack and his attacker was never unconscious.  After defending

22

23   [3] It appears that plaintiff has attempted to raise in his opposition to the pending motion a
     claim that defendant Smith failed to protect him.  However, this court previously granted
24   defendants' motion to dismiss his failure to protect claim brought against defendants Schirmer
     and Wright and did not interpret plaintiff's amended complaint as alleging such a claim against
     defendant Smith.  (Doc. No. 35.)  A new claim is not properly raised in an opposition to a motion
25   to dismiss.  Moreover, plaintiff testified at his deposition that defendant Smith could not have
     done anything to prevent the riot and he also agreed that a claim that defendant Smith failed to
26   protect him would not be appropriate.  (Pl.'s Dep. at 83-85.)

1   himself, plaintiff was shot by Defendant Smith.  Plaintiff argues Defendant Smith failed to

2   protect him, that Smith had no cause to shoot plaintiff, and that Smith's reason for shooting

3   plaintiff is disputed.[4]  (Pl.'s SUDF at 2, Pl.'s Opp'n to Defs. Mot. for Summ. J. at 2-6.)

4          As to defendant Look, plaintiff reiterates his argument that Look used excessive

5   force against him by applying the handcuffs in a forceful manner that caused plaintiff

6   excruciating pain.  Plaintiff argues that Look's application of the handcuffs was so forceful that it

7   essentially constituted a second attack on plaintiff.  (Pl.'s SUDF at 2, Pl.'s Opp'n to Defs. Mot.

8   for Summ. J. at 4.)

9          Finally, plaintiff argues that his claims are properly raised in this § 1983 action

10  and that defendants are not entitled to qualified immunity.  Plaintiff contends that the defendants

11  failed to protect him, and caused him harm, and therefore were not acting in good-faith.  As such,

12  plaintiff argues they are not entitled to qualified immunity.  (Pl.'s Opp'n to Defs.' Mot. for

13  Summ. J. at 6-7.)

14  IV.  Defendants' Reply

15          In reply, defense counsel argues that plaintiff's opposition was untimely and,

16  therefore, should not be considered.[5]  Moreover, defendants argue that plaintiff failed to

17  significantly dispute the defendants' evidence, aside from unsupported and conclusory statements

18  related to only parts of four of defendants' sixty-six undisputed facts.  Finally, defendants'

19  contend that it is undisputed that Smith and Look did not violate plaintiff's rights under the

20  Eighth Amendment because they used only the force necessary to maintain and restore discipline.

21  (Defs.' Reply at 2-3.)

22

23          [4]  Plaintiff does not explain in what way he believes Smith's reason for shooting plaintiff

24  is disputed.

25          [5]  To the extent that plaintiff's opposition may have been untimely filed, the court will
    exercise its discretion to consider the filing in light of the dispositive nature of these findings and

26  recommendations.

1        In response to plaintiff's argument that defendant Smith failed to protect him from

2 an attack and used excessive force against him, defense counsel contends that plaintiff has not

3 presented any evidence disputing defendants' evidence which establishes that during the riot

4 Smith and other staff repeatedly ordered plaintiff to stop fighting.  Counsel also argues that the

5 evidence shows that Smith observed plaintiff standing over another inmate, kicking and

6 stomping the prone and unconscious man in his head and upper torso.  Counsel further argues

7 that it is undisputed that Smith used only the force necessary to protect the safety of the

8 institution and to restore discipline, and that the force was not used maliciously or sadistically to

9 cause plaintiff harm. (Defs. Reply at 3.)

10       In response to plaintiff's argument that Defendant Look used excessive force

11 against plaintiff, defense counsel argues that plaintiff's assertion that he "was attacked again only

12 this time by Look . . . when he was cuffed" is merely a conclusory statement, insufficient to avoid

13 the granting of summary judgment in defendant Look's favor.  (Reply at 4.)

14       Finally, defense counsel reiterates that both defendant Look and Smith are entitled

15 to qualified immunity.  Counsel contends that the undisputed facts demonstrate that neither

16 defendant violated any of plaintiff's constitutional rights.  Morever, even assuming they had,

17 defense counsel argues that the defendants are still entitled to qualified immunity because their

18 conduct was objectively reasonable.

19 ANALYSIS

20 I. <u>Excessive Use of Force</u>

21       The court finds that defendant Smith is entitled to summary judgment on

22 plaintiff's use of excessive force claim.

23       It is well settled that "officials confronted with a prison disturbance must balance

24 the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm

25 inmates may suffer if guards use force." <u>Hudson</u>, 503 U.S. at 7.  Correction officers must

26 balance the need to "maintain order and discipline" against the risk of injury to inmates, and

14

1    "must make their decisions in 'haste, under pressure, and frequently without the luxury of a

2    second chance.'" Id. at 6 (quoting Whitely, 475 U.S. at 320.)  In light of this, "'[p]rison

3    administrators . . . should be accorded wide-ranging deference in the adoption and execution of

4    policies and practices that in their judgment are needed to preserve internal order and discipline

5    to maintain institutional security.' " Whitley, 475 U.S. at 321-22.

6            It is also well established that "whenever prison officials stand accused of using

7    excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core

8    judicial inquiry is that set out in Whitley, i.e., whether force was applied in a good-faith effort to

9    maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S.

10   at 6-7.  To determine whether a prison official's use of force was "malicious and sadistic" for the

11   purpose of causing harm, the court must examine five factors: (1) the need for application of

12   force; (2) the relationship between the need and the amount of force used; (3) the threat

13   reasonably perceived by the responsible officials; (4) any efforts made to temper the severity of

14   the forceful response; (5) the extent of injury suffered by an inmate.  Whitley, 475 U.S. at 321.

15   When presented with a summary judgment motion in this type of case "the court must determine

16   whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of

17   force or the existence of arguably superior alternatives.  Id. at 322.  Thus, in weighing these

18   factors, "unless it appears that the evidence viewed in the light most favorable to the plaintiff,

19   will support a reliable inference of wantonness in the infliction of pain under the standard," the

20   case should not go to a jury.  Id.

21           A.  Defendant Smith

22           Plaintiff and defendants agree that on April 3, 2007 a riot erupted between

23   Northern Hispanic inmates and Asian/Pacific Islander inmates.  (Defs.' SUDF at 2, Pl.'s SUDF

24   at 2.)  Smith claims that he ordered all inmates on the yard to "get down" using the P.A. system

25   but that the rioting inmates continued to fight.  (Defs.' SUDF at 2.)  Smith then fired a warning

26   shot near two other inmates who were kicking and stomping a third inmate.  (Id.)  Smith

                                              15

1    observed that the deployment of multiple grenades of tear gas did not cause the inmates to cease

2    fighting.  (Id.)  Smith then saw plaintiff strike Armendariz in the head and Armendariz fall to the

3    ground, lying face down on his stomach, appearing to be unconscious.  (Id.)  Smith saw plaintiff

4    standing over Armendariz, kicking and stomping him in the head and upper torso.  (Id.)  Fearing

5    for Armendariz's safety Smith fired at plaintiff, striking him in the arm.  (Id.)  According to

6    Smith, he had no contact with plaintiff prior to April 3, 2007, and did not know the identity of

7    the inmate he shot until after the incident.  (Id. at 4.)

8            Smith's version of these events is fully supported by the official reports of other

9    officers.  For example, Officer J. Santana corroborates that the order to "get down" was given

10   and not complied with.  (Doc. No. 76, Attachment 2, part 1, at 39-40.)  Santana saw tear gas

11   grenades deployed, heard two Mini-14 rounds fired, and then saw plaintiff "stomping and

12   kicking" an apparently unconscious Armendariz "with both his feet," prior to Smith shooting

13   plaintiff.  (Id.)  There is a substantially similar report from Officer G. Wallace.  (Id. at 45-46.)

14   Indeed, there are numerous reports from responding officers supporting Smith's declaration.

15   (See Doc. No. 76, Attachment 2, parts 1-3.)  In total, fifteen rounds of munitions from 40mm

16   launchers, five tear gas grenades, and two Mini-14 warning shots were fired before defendant

17   Smith resorted to shooting plaintiff.  (Doc. No. 76, Attachment 2, part 1, at 5.)

18           Conversely, aside from the conclusory allegation that Smith's conduct was

19   excessive, malicious and sadistic, plaintiff has failed to dispute Smith's version of events.

20   Indeed, plaintiff acknowledged at his deposition that he was "too busy fighting" to pay attention

21   to the order to stop.  (Pl.'s Dep. at 49:3-7.)  Plaintiff also acknowledged that when he was shot

22   Armendariz was lying on the ground "under" plaintiff.  (Id. at 51-52.)  Plaintiff could not

23   remember if Armendariz was lying face down.  (Id. at 52.)  Thus, plaintiff has failed to present

24   any evidence establishing a disputed issue of material fact with respect to his excessive use of

25   force claim.

26   /////

1    The undisputed facts establish that defendant Smith witnessed a riot. He and

2  other officers attempted to end the riot with verbal commands. When that failed, other officers

3  administered tear gas. When that failed Smith, and another officer, fired warning shots. After all

4  those lesser degrees of force had been employed, plaintiff was still engaged in physical combat

5  with Armendariz. Smith saw that Armendariz was motionless and lying face down while

6  plaintiff continued his assault. Plaintiff concedes that Armendariz was on the ground with

7  plaintiff on top, and could have been lying face down. Under both versions plaintiff was in the

8  dominant position. Smith claims he was concerned for the safety of Armendariz and therefore

9  fired at plaintiff.

10    While plaintiff claims that Smith was not authorized to "shoot any one for

11  fighting" he has provided no declaration, citation or evidence to support that claim.

12  Plaintiff essentially conceded as much at his deposition. When asked what other evidence

13  plaintiff had to support his claim that Smith's use of force was excessive, plaintiff responded, "I

14  just don't think that I should have been shot in the arm . . . for him fighting back and I'm fighting

15  him . . . it was mutual combat." (Pl.'s Dep. at 57:11-16.) When asked by defense counsel if,

16  assuming Smith made the statement plaintiff alleges, plaintiff had any other evidence that Smith

17  singled plaintiff out to shoot him, plaintiff stated:

18    Okay. I understand now. No - -okay. But that's nothing in - - I
     don't think he was pointing me out on anything. I don't know why
19    he shot me. It's just - - I guess - - I don't want to guess. I don't
     know why he shot me. I just know that I was fighting with another
20    inmate, and I was shot.

21  (Pl.'s Dep. at 60:2-7.)

22    Under these circumstances, the court finds that, while the extent of the injury

23  plaintiff suffered was unquestionably severe, there was need for Smith to employ the level of

24  force that he did against plaintiff. Smith feared for the safety of another inmate and all

25  previously attempted uses of lesser force had failed to end the violence. While shooting plaintiff

26  was an extreme measure, the amount of force used was proportional to the need for such force, as

17

1  all other measures had failed and the life of another inmate was, at least potentially, at risk.  The

2  threat posed to inmate Armendariz by plaintiff was reasonably perceived by Defendant Smith.

3  Plaintiff was engaged in violent combat with another inmate.  If that violence did not cease, one

4  or both of them could have been seriously injured and perhaps even killed.  Finally, it is

5  undisputed that correctional staff engaged in efforts to temper the severity of the force used.

6  Plaintiff and the other rioting inmates had been verbally ordered to "get down."  When that failed

7  staff resorted to tear gas and warning shots from various weapons.  Only when those methods of

8  lesser force failed, and plaintiff was still fighting, did defendant Smith resort to shooting

9  plaintiff.  Under these circumstances it cannot be said that defendant Smith's use of force was

10  not applied in a good-faith effort to maintain or restore discipline.

11        Plaintiff might argue that the December 19, 2007, statement attributed to Smith by

12  plaintiff, and apparently not disputed by Smith, is evidence that Smith's actions were motivated

13  by a malicious and sadistic intent.[6]  Interpreted in the light most favorable to plaintiff, however,

14  the statement at most indicates that Smith believed plaintiff deserved to be shot because of the

15  prior conduct of his fellow Asian/Pacific Islander inmates.  It does not, however, raise a disputed

16  issue of fact regarding whether the force used by Smith was applied at the time in a good-faith

17  effort to maintain or restore discipline.

18        Here there is no genuine issue as to any material fact.  Smith's shooting of

19  plaintiff was in a good-faith effort to maintain and restore discipline and was not maliciously and

20  sadistically motivated to cause plaintiff harm.  See Marquez v. Gutierrez, 322 F.3d 689, 691-92

21  (9th Cir. 2003) (holding that a reasonable officer could believe that shooting one inmate in the

22  leg to stop an assault that could have seriously injured or killed another inmate was a good faith

23  effort to restore order , and thus lawful, even where it was disputed whether the shot inmate was

24  a mere bystander); Avratin v. Bermudez, 420 F. Supp. 2d 1121, 1125-27 (S.D. Cal. 2006)

25

26        [6] Plaintiff, however, does not raise this argument in either his opposition to defendant's motion for summary judgment or his statement of undisputed facts in support of his opposition.

1   (holding that when faced with two inmates fighting on the ground a reasonable officer could

2   believe that shooting one inmate in the leg to stop the fight was a good faith effort to restore

3   order and was therefore lawful).  Smith is therefore entitled to a judgment as a matter of law on

4   plaintiff's claim that Smith used excessive force against plaintiff.[7]

5          Moreover, even if Smith's December 19, 2007, statement were to be interpreted

6   as sufficient to raise a disputed issue of material fact with respect to Smith's intentions in firing,

7   defendant Smith would nevertheless be entitled to qualified immunity if a reasonable officer in

8   that particular factual situation could have believed his conduct was lawful.  See Inouye v.

9   Kemma, 504 F.3d 705, 712 (9th Cir. 2007) ("The 'subjective beliefs' of the actual officer are, of

10  course, irrelevant.") (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)); Marquez, 322

11  F.3d at 692.  "Determining whether a public official is entitled to qualified immunity 'requires a

12  two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2)

13  Under that law could a reasonable state official have believed his conduct was lawful?'" Jeffers,

14  267 F.3d at 910 (citing Browning v. Vernon, 44 F.3d 818, 822 (9th Cir. 1995)).

15         Here the law governing Smith's conduct was clearly established.  At the time of

16  plaintiff's shooting it was "clearly establish[ed] law that a prison guard [was] permitted to use

17  deadly force 'in a good faith effort to maintain or restore discipline' " Jeffers, 267 F.3d at 912

18  (citing Whitley, 475 U.S. at 320.)

19         Smith states that at the time of the riot he was working as an Observation Officer

20  on Delta Yard 1.  As such, Smith was responsible for ensuring the safety and security of all

21  inmates on that yard.  In this regard, Smith was authorized to use increasing levels of force

22

23         [7]  The court is mindful that special care must be taken in deciding cases involving
    excessive use of force claims at the summary judgment stage.  This is because the excessive
24  force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to
    draw inferences therefrom."  Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002).  See also Smith
    v. City of Hemet, 394 F.3d 689, 701 (9th Cir.2005); Lolli v. County of Orange, 351 F.3d 410,
25  415-16 (9th Cir.2003).  However, here plaintiff has simply presented no evidence in support of
    his excessive use of force claims but rather merely relies on his own conclusory assertion that the
26  level of force used against him was not necessary.

1   necessary to subdue an attack, or gain compliance with a lawful order.  After the riot started

2   Smith used lesser force on multiple occasions in an attempt to gain control of the inmates.  Smith

3   resorted to deadly force only after those efforts had failed and plaintiff continued to assault an

4   apparently unconscious Armendariz.  A reasonable official standing where Smith was standing,

5   could certainly have perceived that plaintiff was threatening Armendariz with serious injury or

6   death, that Armendariz was not capable of protecting himself and that the use of deadly force to

7   stop the assault was lawful.  See Marquez, 322 F.3d at 691-92 (holding that a reasonable officer

8   could believe that shooting one inmate in the leg to stop an assault that could have seriously

9   injured or killed another inmate was a good faith effort to restore order , and thus lawful, even

10  where it was disputed whether the shot inmate was a mere bystander); Jeffers, 322 F.3d at 912

11  (holding that under Whitley, "a prison guard is permitted to use deadly force 'in a good faith

12  effort to maintain or restore discipline' " (quoting Whitley, 475 U.S. at 320)); Avratin, 420 F.

13  Supp. 2d at 1125-27 (holding that when faced with two inmates fighting on the ground a

14  reasonable officer could believe that shooting one inmate in the leg to stop the fight was a good

15  faith effort to restore order and was therefore lawful).

16          Thus, even if plaintiff had established a genuine issue as to any material fact with

17  respect to his claim that Smith directed excessive force against plaintiff, Smith would

18  nevertheless be entitled to qualified immunity with respect to this claim.

19          B.  Defendant Look

20          The undersigned also finds that defendant Look is entitled to summary judgment

21  in his favor with respect to plaintiff's excessive use of force claim.  In his amended complaint,

22  plaintiff alleges that he told defendant Look that he had been shot prior to the handcuffing and

23  that Look "was not ordered or instructed" to handcuff plaintiff.  (Am. Comp. at 19.)  At his

24  deposition, however, plaintiff testified that after he was examined by a nurse "someone else" told

25  Look to handcuff plaintiff and that plaintiff could not remember if he told Look he had been shot

26  prior to the handcuffing.  (Pl.'s Dep. at 69-70.)

1    In his declaration in support of summary judgment defendant Look stated that he

2  handcuffed plaintiff pursuant to the authority of California Code of Regulations, Title 15, section

3  3268.2(a)(2), which provides that a prisoner may be handcuffed:

4            When a person's history, present behavior, apparent emotional
             state, or other conditions present a reasonable likelihood that he or
5            she may become violent or attempt to escape.

6  (15 CCR  § 3268.2(a)(2).)  Look could not recall if plaintiff told him that he had been shot and

7  did not recall seeing any blood.  (Decl. Look at 2.)  Look stated in his declaration, provided under

8  penalty of perjury, that he did not intend to cause plaintiff any pain or suffering.  (Id. at 3.)

9    In response to Look's declaration plaintiff offers only the bare allegation that

10 "Look placed [plaintiff] in handcuffs and did not care that this was causing excruciating [pain] to

11 plaintiff" (Pl.'s Opp'n at 4) and characterizes the handcuffing as being "attacked again only this

12 time by Look (in the manner of how he was cuffed.)"  (Pl.'s SUDF at 2.)  Plaintiff offers no

13 evidence to counter Look's declaration stating that he handcuffed plaintiff in response to the riot,

14 in compliance with California law, and without the intent to cause pain or injury.  Indeed,

15 plaintiff cannot even remember if he told Look he had been shot or if he objected to being

16 handcuffed.  (Pl.'s Dep. at 69-70.)  Moreover, plaintiff has not offered any medical records to

17 support his allegation that Look's handcuffing caused him injury.  Plaintiff has failed to point to

18 any evidence in support his claim that Look's use of force was excessive nor has he identified

19 any disputed issue of material fact in regard to this claim.  See Keenan v. Allen, 91 F.3d 1275,

20 1279 (9th Cir. 1996) (the nonmoving party has the burden of identifying, with reasonable

21 particularity, the evidence precluding summary judgment).

22    Moreover, as noted above, in determining whether a prison official's use of force

23 was "malicious and sadistic" for the purpose of causing harm, the court must examine five

24 factors: (1) the need for application of force; (2) the relationship between the need and the

25 amount of force used; (3) the threat reasonably perceived by the responsible officials; (4) any

26 efforts made to temper the severity of the forceful response; (5) the extent of injury suffered by

1    an inmate. Id. In weighing these factors, "unless it appears that the evidence viewed in the light

2    most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of

3    pain under the standard," the case should not go to a jury. Whitley, 475 U.S. at 322.

4          Here, it is undisputed that defendant Look was responding to a riot in which

5    plaintiff and other inmates had engaged in violence. In order to maintain order and control, and

6    ensure the safety of both the correctional staff and inmates, Look handcuffed plaintiff. Even

7    assuming that plaintiff suffered excruciating pain as a result of the handcuffing there was clearly

8    a need for the application of force, as plaintiff and other inmates had just moments earlier been

9    engaged in a violent riot. As noted by plaintiff himself, the two inmate factions had been "at

10    war." Leaving warring combatants unrestrained would have endangered the staff and inmates.

11    Moreover, the relationship between the need and the amount of force used was proportional.

12    Even if Look had been aware plaintiff was shot, the need to handcuff plaintiff would still have

13    been apparent. Plaintiff still had one arm that was uninjured and posed a potential threat to

14    others. The threat was also reasonably perceived by Look as he and other officers had just

15    witnessed plaintiff and nineteen other inmates engage in a violent riot. Finally, the same efforts

16    were made to first use lesser force in handcuffing plaintiff as were made leading up to plaintiff's

17    shooting.

18          There is no genuine issue as to any material fact with respect to plaintiff's claim

19    against defendant Look. The undisputed evidence before the court establishes that Look's

20    handcuffing of plaintiff was in a good-faith effort to maintain and restore discipline and was not

21    maliciously and sadistically motivated to cause plaintiff harm. Look is therefore entitled to a

22    judgment in his favor as to plaintiff's claim that Look used excessive force against him.[8]

23

24       [8] Having found that Look is entitled to summary judgments on the merits of plaintiff's
       excessive use of force claim, there is no need to consider the defense of qualified immunity with
25    respect to this claim. See Wilkie v. Robbins, 551 U.S. 537, 567 (2007). Similarly, the court will
       not consider defendants' facially questionable argument that plaintiff's excessive use of force
26    claim must be raised in a habeas petition, rather than a § 1983 action.

1   II.  Retaliation

2            On November 20, 2008, the court issued an order and findings and

3   recommendations, recommending that defendants' motion to dismiss plaintiff's complaint be

4   granted as to plaintiff's retaliation claims against defendants Schirmer and Wright, but denied as

5   to defendant Smith.  (Doc No. 35.)  Those findings and recommendations were adopted on

6   March 9, 2009.  (Doc. No. 48.)  Thereafter, however, at his October 27, 2009, deposition plaintiff

7   testified that he was not harmed by Smith's alleged statement and agreed to dismiss any claims

8   "arising out of the December 19, 2007, statement."  (Pl.s' Dep. at 86, 94-95.)  Plaintiff also

9   agreed with defense counsel during his deposition that the only claim remaining in this lawsuit

10  was his excessive use of force claim against defendants Smith and Look.  (Id. at 95.)

11           A viable claim of First Amendment retaliation entails five basic elements: (1) An

12  assertion that a state actor took some adverse action against an inmate (2) because of (3) that

13  prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

14  Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

15  Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).  Here, it is now undisputed that the

16  December 19, 2007, statement allegedly made by defendant Smith was not related to plaintiff's

17  exercise of his First Amendment rights.

18           Given his deposition testimony, it is now clear that plaintiff has failed to state a

19  retaliation claim against defendant Smith.  Moreover, it appears that plaintiff has agreed to

20  dismiss this claim.[9]  Defendant Smith is therefore entitled to summary judgment in his favor with

21  respect to this claim as well.

22  /////

23  /////

24  /////

25

26       [9] Plaintiff has chosen not to address his retaliation claim in his opposition to defendants'
    motion for summary judgment.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' January 13, 2010, motion for summary judgment (Doc. No. 75) be granted in its entirety as to all remaining claims; and

2. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 6, 2010.

Dale A. Drozd

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:6
barretto1544msj